,WAGNER, Appellant v. SCOTT.

**Division One, June 29, 1901.**

1. **Libel:** MALICE: MATTER FOR JURY. Where, in a libel case the publication, conceded to be defamatory, comes under the class of "qualified privileges," and the only point is whether there was an abuse of the privilege (that is, whether or not the publication was made in good faith, and where the evidence tends to show that the defendant knew or had the means of knowing his charges were untrue), a prima facie case is made for the jury.

2. ――――: ――――: ――――: CASE STATED. The plaintiff was employed by a number of electric light companies as chief engineer in the joint construction by the companies of underground conduits, and the defendant, as the president of one of them, wrote the president of another a letter which is the foundation of the action, in which there were charges affecting plaintiff's personal and professional standing. Plaintiff's evidence tended to prove that these charges were false, that the defendant either knew or had the means of knowing they were untrue, and that the exigencies of the situation, in the construction of the joint work of the companies, did not call for such charges for the protection of the company defendant represented, and that while the communication was privileged the publication was an abuse of the privilege. *Held,* that these things were evidence of malice proper to be weighed by the jury, and hence, the court should not have forced plaintiff to a nonsuit.

Appeal from St. Louis City Circuit Court.—*Hon. D. D. Fisher,* Judge.

REVERSED AND REMANDED.

*Morton Jourdan* for appellant.

Vol 164 mo—19

(1) Section 14, article 2, Constitution of Missouri, among other things provides: * * * "that in all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury under the direction of the court shall determine the law and the facts." State v. Armstrong, 106 Mo. 395; Military Academy v. Gaiser, 125 Mo. 517. Under the provisions of the Constitution, and the cases cited, the plaintiff in this case had a right to have the jury pass upon the questions as to whether or not the statements made in the letter were true; whether or not they were made in good faith; whether or not from the character of the statements and other testimony they were made maliciously; whether or not they were made in wanton neglect and disregard of the plaintiff's rights; whether or not they were made in the absence of probable cause. There is no authority in this State, or in any other State having similar constitutional provisions, authorizing the trial court to usurp the constitutional functions of the jury to determine both questions of law and of fact, except in cases of absolute privilege. Under the authorities privileged communications are of two kinds: (a) Absolute privilege; (b) qualified privilege. In cases of absolute privilege the court may direct a verdict, but in cases of qualified privilege, such as the one at bar, it is the duty of the court to submit to the jury, under proper suggestions of law, all the propositions above stated, and to permit the jury to pass upon the publication itself, and to determine from the publication whether or not there is malice. (2) Unless the case is one of absolute privilege the question of malice (which is always one for the jury) ought to be submitted to them. 13 Am. and Eng. Ency. of Law, p. 427, par. 2; Hancock v. Backwell, 139 Mo. 451. Words which are actionable *per se* being false, malice is presumed. Mitchell v. Bradstreet, 116 Mo. 242; Addison on Torts, sec. 1100. Communications are not privi-

leged if reckless. Addison on Torts, sec. 1100. Malice may be inferred from a want of probable cause. Smith v. Burrus, 106 Mo. 94. False statements defaming a candidate for public office, though made in good faith, are not privileged. State v. Derry, 20 Mo. App. 558. If the communication be voluntary, then it is not privileged. Callahan v. Ingram, 122 Mo. 364; Mitchell v. Bradstreet, 116 Mo. 242. Malice is always a question for the jury, if there is any evidence of malice whatever. Arnold v. Jewett, 125 Mo. 241; Newell on Slander, p. 392, sec. 10; Hancock v. Blackwell, supra; Sullivan v. Commission Co., 152 Mo. 283.

*F. N. Judson* for respondent.

(1) ·Whether the occasion is such as to make the communication one of privilege, is always a question of law for the court, where there is no dispute as to the circumstances under which it was made. Callahan v. Ingram, 122 Mo. 355; Townshend on Slander and Libel (4 Ed.), sec. 288. (2) The communication complained of was privileged, written in the performance of business duty to a business associate. Finley v. Steele (Mo.), 60 S. W. 108; Bryan v. Collins, 111 N. Y. 143; Klinck v. Colby, 46 N. Y. 427; Marks v. Baker, 28 Minn. 162; Gassett v. Gilbert, 6 Gray 94; 13 Am. and Eng. Ency. of Law (1 Ed.), 423; ·Harris v. Thompson, 13 C. B. 333. (3) Where the communication is privileged (one of qualified privilege), malice is not shown by the mere fact of the falsity of the publication; actual malice must be proved before there can be a recovery. Finley v. Steele, supra; Henry v. Moberly, 6 Ind. App. 490, 33 N. E. 981; Stewart v. Hall, 83 Ky. 375; Briggs v. Garrett, 111 Pa. St. 404; Henry v. Moberly, 51 N. E. 497; Washburn v. Cook, 3 Denio, 110; Townshend on Slander and Libel (4 Ed), pp. 299, 653 and 654; Klinck v. Colby, 46 N. Y. 427. (4)

In the absence of proof of actual malice, a nonsuit should be granted. Finley v. Steele, supra; Briggs v. Garrett, 111 Pa. St. 404; Washburn v. Cook, 3 Denio, 110. (5) The granting of a nonsuit in case of qualified privilege, where there is no proof of malice, does not militate against the constitutional provision that "the jury, under the direction of the court, shall determine the law and the facts." Finley v. Steele, supra; Heller v. Pulitzer Publishing Co., 153 Mo. 205.

BRACE, P. J.—This is an action for libel in which at the close of plaintiff's evidence, the court instructed the jury that upon the evidence the plaintiff is not entitled to recover. Thereupon, the plaintiff took a nonsuit with leave, and his motion to set the same aside having been overruled, he appeals.

Early in the spring of 1897, an ordinance was passed by the city of St. Louis, requiring the electric lighting, heating and power companies in St. Louis to place their wires underground, and said ordinance outlined the mode of procedure which should be followed by these companies in the construction of the underground conduit.

The Missouri Electric and Power Company, the Electric Light, Power and Conduit Company, the Edison Illuminating Company, of St. Louis, being associated and considered as one interest with the St. Louis Electric Light and Power Company, the Phoenix Heat and Power Company, and the Edison Electric Illuminating Company of Carondelet, each representing an individual interest, engaged in the joint construction of this system of conduits. These companies appointed representatives to a committee which was called the "Conduit Construction Committee," whose duty it was to let the contracts for the conduit work and supervise the work and to carry out all the necessary details.

The first three of the above-named companies had one

representative on this committee, the plaintiff, Herbert A. Wagner. The Phoenix Company was represented by Alexander Ross; the Edison Electric Illuminating Company of Carondelet, was represented by E. V. Matlack, its superintendent, and the St. Louis Electric Light and Power Company was represented by D. W. Guernsey.

At this time the plaintiff, Mr. Wagner, was superintendent of the Missouri Electric Light and Power Company. Mr. S. M. Dodd was the president of this company, which company practically owned and controlled the Electric Light, Power and Conduit Company and the Edison Illuminating Company, of St. Louis. Mr. Henry C. Scott, the defendant, was the president of the Edison Electric Illuminating Company, of Carondelet.

In furtherance of the work of construction, the plaintiff was appointed by these representatives as the engineer of the joint construction of the conduit, and it was provided that he should obtain the necessary permits from the board of public improvements, should make requisitions upon the different companies for their proportion of the cost, should have general supervision of the work, should consult freely with the engineers of the companies, and the number of inspectors to be furnished by each company was agreed upon. He was also to certify all contractors' bills, so that the committee could audit the same prior to payment.

Disputes arose between Mr. Fay, an authorized inspector appointed by the Edison Electric Illuminating Company, of Carondelet, and Mr. Wagner, the plaintiff, as to the proper method of conducting the work of building the conduit, and Mr. Fay was removed by Mr. Wagner. Correspondence resulted between Mr. Scott, the defendant, and Mr. Dodd, representing their respective companies, who were thus engaged in the joint work of construction. This correspondence offered in evidence is as follows:

"June 26, 1897.

"Mr. S. M. Dodd, St. Louis.

"My Dear Mr. Dodd: I want to bring to your attention, in a personal way, a matter which I think, from the point of view of the companies owning and interested in the conduit work, is one of importance. You perhaps know that last week our inspector, Mr. Fay, was attacked on the trench, by Mr. Freese, one of Mr. Wagner's subordinates, and that, as the result of this controversy, the work was stopped for a time, Mr. Wagner maintaining that the discipline of the force was affected through Mr. Fay's alleged insubordination. Regarding this charge against Mr. Fay, I will state that I have personally looked into this matter with the utmost care, and have spent two or three days giving the matter close attention, and I assure you on my personal word, that I can find nothing whatsoever, to justify any such charge. The man is, on the contrary, unusually intelligent, and the records of the work will show that in the matter of (1) defective pipe found, (2) improper mixing of the concrete cement, (3) the imperfect manner of putting the cement in the trench, (4) reporting inadequate amount of cement in the trench, as called for in the contract, all of which reports are a matter of record in the work, Mr. Fay was of very material aid to us and to your people, in seeing that the contractors properly carried out their undertaking.

"Because we do not, while we are in the midst of this work, wish to take the time of the officers of our company to post a new man in the duties of inspecting the work, we are loath to take Mr. Fay from the work. Now, I want to enlist your personal offices in seeing either that Mr. Fay be allowed to take a place as one of our appointees under the engineer, or else that the extraordinary objection that we shall not even be given the right to send Mr. Fay out on this work to make

inspections of it and report to us, direct, be removed.

"I write you this letter after having thought the matter over with a great deal of care, and because (1) I am entirely unwilling that so large an amount of our stockholders' money be expended by us without a careful inspection of the work, which inspection has been found most necessary by the reports turned in by Mr. Fay and the other inspectors, and (2) I believe that you will conclude, on thinking over the matter, that it is unwise for us to let the contractor see that one who has been most vigilant in watching this work and keeping up its standard be taken off the work altogether. As far as the character of Mr. Fay's work is concerned, we make no point as to whether he shall be employed under Mr. Wagner or not. In either event we are, of course, to pay his wages, but I submit to you that it is most extraordinary that Mr. Wagner or anybody in charge of this work, should question the right of this company to give whatever inspection it pleases and in any amount which it thinks necessary, at its own expense, and, feeling that the interests of your company and ours are equally involved in this matter, I have written you asking that you will use your influence in preventing any further useless controversy through our determination to give the work that inspection and supervision which in our judgment is required.

"Very truly yours,

"HENRY C. SCOTT."

To which Mr. Dodd replied as follows:

"Edison Illuminating Company of St. Louis.

"June 28, 1897.

"Mr. Henry C. Scott:

"My Dear Sir: Yours of the twenty-sixth I received this morning, and carefully note its contents. I also have a

Wagner v. Scott.

report of the committee composed of Mr. Ross and Mr. Guernsey, which is very definite. I see that it will be very easy for you to place some one in Mr. Fay's place that will be entirely competent and satisfactory to all parties concerned, and I suggest to you to use your authority and good offices as executive officer of the Edison Company of Carondelet, and make such appointment.

"If the report had been made against any of our men I should certainly put some one in his place without delay.

"Yours very truly," etc.

On the next day the defendant wrote and caused to be delivered to Mr. Dodd a letter as follows:

"St. Louis, Mo., June 29, 189-.

"Mr. S. M. Dodd:

"My Dear Mr. Dodd: I have been trying all day to see you to answer your letter of yesterday in person, and also to report to you some very serious complications which have come up and which I hope very sincerely have not received your sanction or approval.

"It seems most remarkable that in all instances Mr. Wagner and the contractor work in unison to resist inspection of the work by this company. You can use your own judgment in determining whether this will tend to improve the character of the work done or not. I rest the matter entirely with you as to whether it is dangerous to the interests of your own company that such a condition exists, but in the case of the property that I have charge of, I am compelled to state to you, as Mr. Wagner's superior officer, that I will not submit to the outrages which he has perpetrated against this company and which I believe he intends to continue to perpetrate, and that we shall hold him directly accountable for any loss or damage

which is incurred by us because of these outrages.

"I do not want to worry you with too elaborate a bill of particulars, but I will state that it came definitely to my knowledge that an understanding had been reached by Mr. Wagner and the contractor that not only would Mr. Fay be driven off the work this morning, but that other of our employees of our company would be served in the same way if sent to take care of the important duty of inspecting this work and reporting to this office.   Mr. Wagner, over the telephone, stated to Mr. Matlack that not only Mr. Fay would be driven off the work, but that if Mr. Matlack appeared there he would be driven off, and that if he chose to risk being bodily injured, he could appear on the work.   I call your attention to the fact just here that Mr. Matlack is one of the corporate officers of our company, and I can not, therefore, too strongly condemn the threat cast out by Mr. Wagner as above stated.   I will further add that Mr. Wagner stated that he spoke for his company in issuing this threat, after consultation with its officers.   I wish to state, further, that on the work to-day an attempt was made by Mr. Wagner to arrest one of our men who was in no way interfering with the work, but was simply making an examination of it to report to the company, as directed by me.   The officer, of course, refused to make the arrest.   I will state, further, that Mr. Wagner, his representatives, and the contractor, adopting precisely the same methods, have continually insulted every representative we have sent on this work, until I believe not one man in our employ feels other than he risks a personal encounter with Mr. Wagner or some of his underlings when he appears on the trench.   As a further indication of the high-handed outrages which we have had to suffer at Mr. Wagner's hands, I will state to you that he went up to the city hall yesterday and changed the plans of this company, signing the name of our company, as one of its representatives.

It is perfectly plain to you, as one having charge for many years of large corporations, that this action on the part of Mr. Wagner is closely akin to forgery. I will state that we have written the board of public improvements and the supervisor of city lighting in future not to recognize any directions of any kind given on behalf of our company, except on written orders of the officers of the company. Mr. Wagner not only had no excuse for forging the name of our company, but he had distinct evidence before him that we objected to the proposed change in plans, and our letter of June 26, of which I herewith enclose a copy, clearly sets forth this fact.

"I am exceedingly loath to do anything disagreeable either to you or to any of our friends interested in this company. I must beg to remind you, however, that this is a very serious matter to me, as one in a place of responsibility, and unless your reply to this letter, or an interview—which I have repeatedly sought for the last two days without being able to secure same—results in an adjustment of these difficulties, so that I can feel that the interests of our company will not be further jeopardized through a clear alliance which has been entered into by the chief engineer of this construction work and the contractor, I shall call our board of directors together and rest the matter in their hands, being entirely content that if they think we should permit this treatment of a most important matter, to have them relieve me of all responsibility and assume it themselves. I will state further that I have brought this matter to the attention of our people, and, as far as I am able to see, they unqualifiedly support me in my position, as I believe you will do, after you have carefully reviewed the whole question or obtained from me the facts which I have in my possession, and upon which I stand ready to convince you (1) that the attack upon Mr. Fay by Mr. Wagner's assistants was a premeditated arrangement between Mr. Wagner and

the contractor; (2) that Mr. Wagner has, since he has been in charge of this work, steadily endeavored to support the contractor in slighting the work by resisting all of the criticisms made by us on the poor work (in every case, however, our criticisms were sustained and the work was properly done because of our protests) ; (3) that Mr. Wagner and the contractor are under distinct arrangement to prevent, by force, if necessary, any further inspection on our part, no matter whom we may employ, of the conduit work yet to be done.

"Inasmuch as I have not been able to see you, and inasmuch as it seems very necessary that I put myself clearly on record in this matter, I have written you this letter, trying to do so with the utmost deliberation, and in the belief that you will see that we are not forced to resort to other means for the proper protection of our interests, which not only I, but every one of our directors to whose attention I have brought this matter, believe to be seriously assailed.

"Illustrative of the importance of honest and careful inspection of this work, and of the contractor's interest that no inspection be made, I quote from the reports of the work in the hands of our engineer, that as much as sixty per cent of a single delivery of pipe on the trench was rejected, and the rejection sustained on account of its manifestly bad quality.

"Yours truly,
"HENRY C. SCOTT."

This last letter of June 29, 1897, the plaintiff in his petition charges, was false and libelous, and was maliciously written and published in manner aforesaid. "That defendant thereby meant and intended to charge and did charge and thereby meant to impress and did impress the said S. M. Dodd and all other persons to whom said letter and written words aforesaid were published, that plaintiff and the contractors

aforesaid were working in unison to resist and prevent the
proper and legitimate inspection of the work by said companies,
and that plaintiff, conniving and conspiring with said contract-
ors in refusing a proper inspection of said work, was aiding and
abetting and assisting said contractors in slighting said work,
and that said alleged action of plaintiff was the result of a
premeditated and distinct arrangement and understanding be-
tween said plaintiff and said contractors; that the defendant
thereby meant and intended to charge and did charge, and
thereby meant to impress and did impress the said S. M. Dodd
and all other persons to whom said letter and written words
aforesaid were published, that plaintiff was wholly unworthy
of confidence and trust in his said capacity and profession of
engineer and superintendent; that said letter and written
words were so read and understood by said S. M. Dodd and
all other persons to whom said letter and written words were
published.

"That defendant thereby meant and intended to further
charge and did further charge this plaintiff with the crime and
felony of forgery; that said letter and written words were so
read and understood by S. M. Dodd and all other persons to
whom said letter and written words were published.

"That said letter and written words aforesaid were
written, or caused to be written, and published by defendant
with malice toward plaintiff and was calculated to, and did
deprive him of public confidence and expose him to public
hatred; that by reason of the same he, the plaintiff has been
damaged in the sum of twenty thousand dollars, and plaintiff
says that the further sum of five thousand dollars should be
assessed against defendant as punitive damages."

The answer of the defendant, after reciting the circum-
stances under which the letter was written, avers that all the
facts therein set out, he, at the time, believed to be true. That

said letter was written without any malice whatever towards the defendant and solely for the purpose of protecting the interests entrusted to him, and of advising said Dodd, his associate in business, of said matters. Wherefore, he says that said letter was privileged in law, and that he is not answerable therefor.

Issue was joined on the answer by reply.

(1) That the letter complained of was defamatory, that it was published, and that the evidence introduced by the plaintiff tended to prove that the charges therein contained, prejudicial to the plaintiff, were not true, is conceded. But it is contended for the defendant that the question of privilege was one of law to be determined by the court and therefore the court did not err in taking the case from the jury.

It must also be conceded that the publication can only be one of conditional and not of absolute privilege.

"A privileged communication is an exception to the rule that every defamatory publication implies *malice*. A qualified privilege is extended to a communication made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty either legal, moral or social, if made to a person having a corresponding interest or duty and the burden of proving the existence of malice is cast upon the person claiming to have been defamed." [Newell on Slander and Libel (2 Ed.), p. 391, sec. 6; Finley v. Steele, 60 S. W. Rep. 108; Sullivan v. Com. Co., 152 Mo. 268.]

In the text-book cited which is the latest publication on this subject, the author says, "The theory of privilege in connection with the law of defamation involves a variety of conditions of some nicety, and also a. doctrine not always of easy application to a set of facts, and such being the case in any trial, whether civil or criminal, while the questions of libel

or no libel, malice or no malice, are matters of fact for the jury, the question of privilege or no privilege is entirely one of law for the judge. That is to say, it is exclusively for the judge to determine whether the occasion on which the alleged defamatory statement was made was such as to render the communication a privileged one. The jury, however, will be the proper tribunal to determine the question of express malice where evidence of ill-will is forthcoming; but if, taken in connection with admitted facts, the words complained of are such as must have been used honestly and in good faith by the defendant, the judge may withdraw the case from a jury and direct a verdict for the defendant." [Newell on Slander and Libel (2 Ed.), pp. 391-2, sec. 9.] But as was said by KELLEY, C. B., in Cox v. Lee, 4 L. R. Exchequer, loc. cit. 288: "It is only when the judge is satisfied that the publication can not be a libel, and that, if it is found by the jury to be such, their verdict will be set aside, that he is justified in withdrawing the question from their cognizance."

The general doctrine upon this subject is well stated by BIGELOW, J., in Gassett v. Gilbert, 6 Gray loc. cit. pp. 97, 98 and 99: "The question, whether in a particular case a publication is to be deemed privileged, that is, whether the situation of the party making it and the circumstances attending it were such as to rebut the legal inference of malice, is a question of law to be determined by the court in the first instance (Coxhead v. Richards, 2 C. B. 569; Taylor v. Hawkins, 16 Ad. & El. N. R. 308). But, in deciding this question, the conditions on which it is to be held to be privileged must necessarily be assumed; that is, it must be taken for granted that the publication was believed, by the party who made it, to be true, and that it was made bona fide; because, if these elements are found to be wanting, then the jury would be authorized to infer malice. The sole duty of the court,

therefore, in such cases, is to determine whether the occasion, in the absence of actual malice, would justify the publication. If so, then it is incumbent on the plaintiff to prove the existence of malice in order to sustain his action; and this must be shown to the satisfaction of the jury, whose exclusive province it is to pass upon the question. But it is not necessary to prove it by extrinsic evidence. It may be inferred from the relation of the parties, the circumstances attending the publication, and even from the terms of the publication itself. [Wright v. Woodgate, 2 Cr. M. & R. 573, and Tyrwh. & Gr. 12.] * * * The defendants can not be justified if they have included in their notice any statements or language of a defamatory nature, not warranted by the occasion which called forth the publication. The privilege must be limited by the exigency; and if the defendants, by the terms of the notice published by them, exceeded the just limits which were necessary and proper to accomplish the legitimate purpose of protecting the corporation and the public from the unauthorized acts of the plaintiff, it will be evidence of malice proper to be weighed by the jury. So, too, the question of good faith on the part of the defendants, and their honest belief in the truth of the statements put forth by them, are matters of fact which are to be determined exclusively by the jury. Although it is not necessary for the defendants to prove the truth of the statements contained in the notice, in order to justify the publication, yet proof of their falsity is admissible on the part of the plaintiff to show that the defendants did not act on an honest belief in their truth." These views are in harmony with the general current of authority and with our own rulings on the subject, so far as they have gone. [Heller v. Pulitzer Pub. Co., 153 Mo. 205; Sullivan v. Com. Co., 152 Mo. 268; Arnold v. Jewett, 125 Mo. 241; McGinnis v. Knapp, 109 Mo. 131; State v. Armstrong, 106 Mo. 395.] Of course at this stage of the

case, it would not be proper for us to comment, much less to express our opinion, upon the evidence in the case. But applying the principles stated to the plaintiff's evidence as it appears in the record before us, we have no hesitation in saying that it made a prima facie case for the jury. The publication contained very grave charges against the plaintiff affecting his personal, professional and official standing, and character, made in a quarter calculated to do him serious injury. His evidence tended to prove that the charges were false, that the defendant either knew or had the means of knowing that they were untrue. That the exigencies of the situation did not call for such charge for the protection of the interests the defendant had in charge, or warrant the language in which they were made, and that while the occasion was privileged, the publication was an abuse of the privilege. Hence, the case ought to have gone to the jury, and the court erred in refusing to set aside the nonsuit. The judgment of the circuit court will therefore be reversed and the cause remanded to that court for trial.

All concur.